UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:11-CV-425-H

DOUGLAS P. SUMNER                                                                    PLAINTIFF

v.

ARMSTRONG COAL COMPANY, INC.                                          DEFENDANT

**MEMORANDUM OPINION**

This case involves a contract dispute and is on remand from the Sixth Circuit Court of Appeals. One issue remains: whether Plaintiff Douglas P. Sumner ("Sumner") is entitled to commissions under coal supply contract J10007 pursuant to a Consulting Agreement he entered with Defendant Armstrong Coal Company, Inc. ("Armstrong"). Sumner claims that Armstrong shifted some of the tonnage of coal from supply contract J07032, a contract under which he is owed commissions pursuant to the Consulting Agreement, to supply contract J10007, a contract under which he is not. This Court previously granted summary judgment in favor of Sumner regarding liability for commissions on two other coal supply contracts related to the Consulting Agreement, J10009 and J07032, but dismissed Sumner's claim for commissions on J10007, which had the effect of granting *sua sponte* summary judgment to Armstrong for that contract.

The parties cross appealed the grants of summary judgment regarding J10009 and J10007. The Sixth Circuit affirmed Armstrong's liability to Sumner for commissions on all coal sold under J07032, as amended, and J10009. The Sixth Circuit reversed and remanded the *sua sponte* grant of summary judgment in Armstrong's favor to afford Sumner the opportunity to conduct discovery and develop facts regarding his coal shifting theory.

I.

The circumstances surrounding this case have been briefed extensively. This Court adopts the Sixth Circuit's version[1] of the following relevant background:

> Armstrong was formed in 2006 for the purpose of acquiring and developing coal reserves in Western Kentucky to sell the coal to end-users, such as utility companies. Shortly after Armstrong's inception, it entered into a letter agreement with Sumner to provide consulting services and negotiate contracts on behalf of Armstrong with Louisville Gas and Electric Corporation (LG & E), a potential end-user. The agreement promised to pay Sumner $0.35 cents per ton of coal sold to LG & E for any contract entered into prior to December 31, 2007, and gave Sumner "the exclusive right to negotiate a contract with LG & E."
>
> On April 7, 2007, Armstrong and Sumner executed a consulting agreement . . . . The consulting agreement gave Sumner exclusive rights to negotiate with LG & E and an additional potential end-user, Big Rivers Electric Corporation, but provided that Armstrong is responsible for the final acceptance of any contracts Sumner negotiates. It also states that Sumner will be entitled to commissions on coal shipped under long-term contracts executed during the term of the consulting agreement, even if the shipments extend beyond the end of the term. The parties later amended the consulting agreement to clarify that Sumner is not entitled to compensation for contracts, purchase orders, or "spot market" sales that last for a term of less than one year.
>
> In December 2007, Sumner assisted Armstrong in negotiating a contract with LG & E in which Armstrong agreed to provide LG & E with 27.1 million tons of coal through 2015. This contract—known as Contract No. J07032—became effective January 1, 2008 . . . . On December 22, 2009, Armstrong and LG & E [ ] reduced the total volume of coal to be supplied under J07032. On the same day, Armstrong entered into two new contracts with LG & E—Contract Nos. J10007 and J10009. J10007 provided for the sale of 600,000 tons of coal from January 1, 2010 through December 31, 2010 . . . . It is undisputed that Sumner did not participate in the contract negotiations for J10007 or J10009 or the amendments to J07032. The consulting agreement between Armstrong and Sumner expired on midnight on December 31, 2009.

Following remand, Sumner has had the opportunity to develop his coal shifting theory and the parties have provided the following additional relevant information. On September 9, 2009, Armstrong wrote a letter to LG&E[2] and invoked the "Environmental Law Force Majeure"

---

[1] *Sumner v. Armstrong Coal Co., Inc.*, 533 F. App'x. 583, 584-86 (6th Cir. 2013).
[2] Dkt. No. 48-7.

clause in supply contract J07032. This clause permitted Armstrong to propose corrective action or terminate the supply agreement if it decided that "the adoption or reinterpretation of laws, regulations, policies, or restrictions, or change in the interpretation or enforcement thereof" rendered it impossible or uneconomical to produce coal under the terms of the agreement.[3] Armstrong claims that below market prices in the contract, delay in obtaining necessary permits, and a change in regulations and policies as contemplated in the force majeure clause made performance impossible or uneconomical. As corrective action, Armstrong sought an increased price per ton and other concessions with regard to coal to be shipped under J07032.

Armstrong and LG&E entered into negotiations to amend their existing coal supply agreement. Armstrong provided LG&E with documentation of its increased costs as a result of regulatory changes and its inability to obtain key permits. These increased costs included over $60 million in stranded investments.[4] In an internal document, LG&E acknowledged that Armstrong was providing coal at a below market rate and concluded that, under the force majeure clause, Armstrong could "walk away from their contractual obligation to supply coal under the agreement."[5]

On October 19, 2009, after three weeks of negotiations, LG&E sent Armstrong a proposal to resolve the dispute.[6] The proposal's subject line reads: "Revised Proposal re

---

[3] Dkt. No. 26-4 at § 10.2.
[4] Armstrong explained its increased costs as follows: "(a) approximately $14 million related to two draglines that had been stranded without the issuance of the Equality Boot permit; (b) approximately $15 million due to increased costs for the construction of the coal loading and unloading facilities due to the anticipated inability to obtain the necessary permits in order to cross-over certain wetland, floodplain, and stream areas; (c) approximately $20 million related to the construction of the coal-handling and preparation plant near the dock stranded by regulator issues concerning waste disposal; (d) approximately $44 million related to mining equipment purchased and commitments stranded as a result of the inability to obtain the Equality Boot permit; (e) approximately $3.3 million related to electric service contracts, extra permitting, and environmental studies; and (f) substantial costs related to accelerating production in other mines in order to fulfill the LG&E purchase requirements that otherwise would have been satisfied from the Equality Boot mine." *See* Dkt. No. 46-1 at 9.
[5] *See* Dkt. No. 46-1 p. 10.
[6] Armstrong suggests the relevant proposal was made on October 12, 2009. Sumner argues that the October 12 letter was a draft and that the October 19 letter constitutes the actual proposal. The relevant difference between

3

Resolution of Section 10.2 Issue and Restructuring of Coal Supply Agreement dated as of January 1, 2008 (No. J07032; as amended, the 'Contract')." The letter states the following:

> As discussed in our phone conversation today, below is our understanding of the basis for a resolution of the issues among the parties. LG&E and KU withdraw their proposal set forth in my last letter to you (dated October 12, 2009, but sent on October 15, 2009) and, in its place, propose[] the following (all of which constitutes the proposal).[7]

It suggests amending J07032 by reducing the total amount of coal to be purchased and extending delivery over a longer period of time. Armstrong and LG&E/KU eventually adopted these terms as Amendment No. 2 to J07032 in December 2009. The letter also proposed another contract to extend over the time-period of one year, which terms became J10009, executed in December 2009. Finally, the letter proposed a new short-term contract by stating: "LG&E/KU would enter into a new spot agreement with Armstrong based on the following general terms." The terms of the proposed spot agreement required Armstrong to provide 600,000 tons of coal at $41 per ton from January 1, 2010 through December 31, 2010. These terms became J10007, also executed in December 2009. The price per ton under J10007 is over $10 greater than that under the amended J07032.

Sumner sees the entire October 19, 2009 letter as the proposal for restructuring J07032, and thus views J10007 as an amendment of J07032. As such, Sumner argues that Armstrong has breached the Consulting Agreement by failing to pay him commissions under J10007. Sumner also claims that Armstrong breached the Consulting Agreement by excluding him from the restructuring negotiations. Finally, Sumner claims Armstrong breached the Consulting Agreement's implied covenant of good faith and fair dealing by restructuring J07032 to avoid

---

these letters is that the October 12 proposal includes the language "If Armstrong desires" before suggesting the spot contract terms that became J10007. The October 19 letter strikes this language and simply states that "LG & E would enter" the spot agreement. Sumner believes this difference undermines Armstrong's argument that the spot contract that became J10007 was the result of a unilateral offer.

[7] Dkt. No. 48-11.

4

paying Sumner a commission on the tonnage contemplated in J07032 prior to the disputed restructuring. Armstrong counters that J07032 bears no relationship to J10007 and that LG&E unilaterally proposed the spot contract following negotiations for restructuring J07032.

II.

A party is entitled to summary judgment where the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court must decide if "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251−52 (1986). Here, both parties have moved for summary judgment. This Court now considers each of Sumner's claims regarding J10007 in turn.

III.

Sumner claims that Armstrong breached Section 11(h) of the Consulting Agreement by excluding him from negotiations with LG&E regarding the restructuring of J07032. Section 11(h) of the Consulting Agreement states as follows:

> During the Term, Sumner shall have the sole and exclusive rights to negotiate contracts for the purchase and sale of coal with LG&E and Big Rivers on behalf of Armstrong. During the Term, Armstrong shall not engage, hire, compensate or otherwise use any other person or entity other than Sumner (provided, however, this shall not prevent any employees, directors or officers of Armstrong or its affiliated [sic] from working with Sumner under this Agreement) to negotiate terms, conditions, contracts or agreements for the purchase and sale of coal by Armstrong to LG&E and/or Big Rivers.[8]

---

[8] Dkt. No. 16-2.

5

Sumner believes this language made him Armstrong's sole and exclusive agent for such negotiations; Armstrong claims this language only precluded it from hiring another outside coal broker.

Contract interpretation is a matter of law for the court to determine. *See Davis v. Siemens Med. Solutions USA, Inc.*, 399 F. Supp. 2d 785, 792 (W.D. Ky. 2005). In interpreting a contract, a court seeks to effectuate the intentions of the parties. *See Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384-5 (Ky. App. 2002). A contract must be construed as a whole, giving effect to all provisions where possible. *See id.* at 384-5. Where no ambiguity exists, a court will enforce the ordinary meaning of the terms of the agreement. *See Davis*, 399 F. Supp. 2d at 792. A contract is ambiguous when it is "reasonably susceptible to different or inconsistent interpretations." *Id*.

Viewing the Consulting Agreement as a whole, Armstrong's interpretation is unambiguously aligned with the its clear meaning. Sumner and Armstrong amended their Consulting Agreement in February 2009 to allow Armstrong to negotiate for spot and other short term contracts without compensating Sumner. That amendment provides the following:

> Sumner shall not be entitled to any consideration for coal shipped under any LG&E and Big Rivers Contracts after the Initial Term unless the term of such contract exceeds one year, and under no circumstance shall Sumner be entitled to the payment of any consideration for coal shipped after the Initial Term pursuant to any purchase order(s) and/or coal sold on the spot market.[9]

This language clearly allows Armstrong to enter contracts with LG&E that do not entitle Sumner to commissions. Thus, Sumner's argument that Armstrong could not negotiate independently and directly with LG&E is illogical. Further, Section 1 of the Consulting Agreement states "Armstrong shall be responsible for the execution, and final acceptance of, the LG&E and Big

---

[9] Dkt. No. 22-4.

Rivers Contracts."[10] That Armstrong had the final say in approving contracts indicates that Sumner served at Armstrong's pleasure and discredits the idea that Armstrong had an affirmative obligation to include Sumner.

As a matter of law, this Court finds that Armstrong did not breach Section 11(h) of the Consulting Agreement by negotiating with LG&E/KU without Sumner's involvement.

## IV.

Sumner further claims that Armstrong breached the Consulting Agreement by failing to pay him a commission for coal sales under J10007. Sumner claims that contracts J10009 and J10007 are a "direct result" of Armstrong and LG&E amending the original agreement, J07032. He believes LG&E shifted coal from J07032 to these new supply contracts and that Armstrong owes him royalties for coal sold under these renegotiated terms—regardless of whether the new terms are framed as separate contracts or amendments to J07032. This Court already determined, and the Sixth Circuit affirmed, that Armstrong owes Sumner commissions for coal sold under J07032. Further, Recital B of the Consulting Agreement states that Armstrong owes Sumner commissions for any amendments or extensions of contracts within the scope of the agreement.

In any event, Sumner and Armstrong amended the Consulting Agreement in February 2009 to exclude spot contracts. Amendment No. 1 clearly states that spot contracts, such as J10007, are exempt from commission fees. The language states: "**under no circumstance** shall Sumner be entitled to the payment of any consideration for coal shipped after the Initial Term pursuant to any purchase order(s) and/or coal sold on the spot market" (emphasis added). Thus, adopting Sumner's position would require ignoring the express and clear language of the parties' Consulting Agreement.

---

[10] Dkt. No. 16-2.

Sumner cites *Consolidated Realty Co. v. Graves* as authority for the proposition that in Kentucky, a party may not modify an existing contract and treat it as a new, unrelated contract to avoid a broker's commission. 165 S.W.2d 26 (Ky. 1942). However, *Graves* is distinguishable from the present circumstances. There, the court relied on a side letter between the parties stipulating that the broker would be entitled to a commission regardless of whether an extension of the agreement included the same terms. *Id.* at 30. This side letter was dispositive. *Id.* In contrast, the parties here expressly agreed that spot contracts or contracts running for less than one year would be exempt from commission fees—and J10007 is a spot contract running for less than a year.

For these reasons, this Court finds that the express language of the Consulting Agreement, as amended, exempts spot agreements such as J10007 from commission fees. Thus, Armstrong did not breach the Consulting Agreement by failing to pay Sumner a royalty for coal shipped under J10007, which falls outside of the scope of the Consulting Agreement.

V.

This brings us to Sumner's claim that Armstrong breached the implied covenant of good faith and fair dealing in the Consulting Agreement by denying him the benefit of the bargain the parties originally intended. Every Kentucky contract contains this covenant. *Ranier v. Mt. Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991). To succeed on such a claim, a party must "provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." *O'Kentucky Rose B. Ltd. P'ship v. Burns*, 147 F. App'x. 451, 457-58 (6th Cir. 2005) (applying Kentucky law) (quoting 23 Williston on Contracts § 63:22 (4th ed. 2004)).

The implied covenant of good faith and fair dealing does not preclude a party from exercising express contractual rights. *See Farmers Bank & Trust Co. of Georgetown, Ky., v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005); *see also Dodd v. Dyke Indus., Inc.*, 2008 WL 1884081, * 7 (W.D. Ky. 2008). It is not a breach of the covenant for a party to act according to the express terms of an agreement. *See Hunt Enterprises, Inc. v. John Deere Indus. Equip. Co.*, 18 F. Supp. 2d 697, 700 (W.D. Ky. 1997). Amendment No. 1 clearly contemplated that Armstrong had the right to enter spot agreements with LG&E, and Armstrong has simply exercised those rights.

Sumner claims that a party exercising express rights in an agreement may still owe an obligation to act in good faith, citing *RAM Eng'g & Constr., Inc. v. Univ. of Louisville*, 127 S.W.3d 579 (Ky. 2003). In *RAM*, the court found that the government could exercise its contractual right to terminate an agreement "for convenience" in compliance with the implied covenant of good faith and fair dealing only where it was no longer in the government's best interests to remain in the contract because of a change in circumstances. *See id.* at 585.

This standard runs counter to the majority of the case law. *See Hunt Enterprises*, 18 F. Supp. 2d at 700. Even under *RAM*'s standard, though, Armstrong has provided ample evidence that because of changed circumstances, revising J07032 to reduce the amount of coal provided under the agreement and obtain a higher price per ton was in Armstrong's best interests. Because J10007 offered Armstrong a higher rate per tonnage for a smaller quantity of coal, this contract similarly made economic sense.

Further, there is no substantiated evidence that Armstrong acted in bad faith. Sumner claims that Armstrong excluded him from its negotiations with LG&E with the bad faith intent to deny him a commission. Sumner cites the affidavit of Armstrong's president Martin Wilson for

support. In his affidavit, Wilson said that he would have waited to execute J10009 until Sumner's Consulting Agreement expired if the company and LG&E intended the agreement as anything more than a conditional, contingent agreement. This statement does not provide any evidence that Armstrong acted in bad faith or unreasonably as to Sumner in entering J10007, a spot contract with a higher price per ton, nor does it undermine the evidence that Armstrong revised J07032 for legitimate business reasons that had nothing to do with Sumner.

Spot contracts are common in the industry. The record indicates that Armstrong accepted the terms LG&E proposed without further negotiation. While it is possible that the parties discussed a spot contract in the telephone call referenced in LG&E's October 19 letter, Sumner has not pointed to any evidence in the record that mentions the spot agreement prior to LG&E's October 12[11] and 19 proposals or provided evidence that Armstrong mentioned Sumner's name in communications with LG&E or internally during the restructuring negotiations.

Sumner's theory that Armstrong shifted coal from J07032 to J10007 is similarly unsubstantiated. Apart from reiterating the contemporaneous timing of the agreements, Sumner provides no evidence that Armstrong shifted coal between the contracts, let alone that Armstrong restructured the agreement with the bad faith motive to avoid paying Sumner a commission. In fact, Armstrong's own evidence entirely discredits this theory. The combined tonnage of all three related contract supply agreements between Armstrong and LG&E—the amended J07032, J10009, and J10007—is substantially less than the original agreement under J07032. This overall reduction strongly indicates that changed circumstances, rather than any intent to reduce Sumner's commissions, spurred negotiations to amend J07032.

Sumner's coal shifting theory idea is further discredited by the different terms under each coal supply agreement. The agreements provide different terms governing when Armstrong may

---

[11] Apparently this proposal was sent on October 15, 2009 but dated October 12, 2009.

be excused from performance. Critically, J10007 provides Armstrong over ten dollars more per ton than the amended J07032. This price difference makes it even more implausible that Armstrong harbored any bad faith motive in entering J10007, because it is incredible to believe that LG & E would have agreed to pay this higher price without a legitimate business reason or in order to aid Armstrong in manipulations to circumvent Sumner's commission.

Finally, Armstrong points out that Sumner has benefited from this deal—Armstrong could have terminated its agreement with LG&E under § 10.2 and Sumner would not have been entitled to any royalties. Instead, Sumner has already collected millions.

VI.

Sumner further requests the Court issue a declaratory judgment stating that Armstrong must pay Sumner a commission for all coal shipped under J07032 and J10009 as they existed on the date of the complaint and as they may hereafter be amended, extended, or split out into separate contracts or purchase orders. The Court considers this question premature because it is based on the hypothetical potential that the contracts in question are split, amended, or extended.

VII.

Sumner also seeks attorney fees and costs from Armstrong. In the absence of a specific contractual provision, Kentucky adheres to the American rule that each party is responsible for his or her own attorney fees. *See Aetna Casualty & Surety Co. v. Commonwealth*, 179 S.W.3d 830, 842 (Ky. 2005). Sumner points to Paragraph 7(a) of the Consulting Agreement, which he claims entitles him to recover attorney fees. Paragraph 7(a) states the following:

> Armstrong shall reimburse and indemnify and hold Sumner, his affiliates and each of his representatives and agents harmless against and in respect of any and all damage, loss, liability, deficiency, settlement payments, costs, levies, expenses or obligations, whether or not the result of a third party claim (collectively, "Damages"), in connection, resulting from or relating to: a) any and all liabilities or obligations of any nature whatsoever of or relating to Armstrong's

11

operations and businesses or the actions of the Armstrong's shareholders, officer, employees, representatives or agents; b) any misrepresentation, breach of warranty or nonfulfillment of any covenant or agreement on the part of Armstrong under this Agreement; c) any and all liabilities or obligations of any nature whatsoever of or relating to the LG&E and Big Rivers Contracts, excluding a breach of any term of this Agreement by Sumner; and d) any and all actions, suits, claims, allegations, proceedings, investigations, audits, demands, assessments, fines, judgments, settlements, levies, costs and other expenses (including without limitation reasonable audit and legal fees) incident to any of the foregoing; provided, however, that Sumner, shall not be entitled to indemnification from Armstrong in any respect or manner whatsoever arising from, in connection with or related to any fraudulent, negligent or malicious conduct of Sumner, his affiliates, representatives or agents.

This indemnification provision is clearly irrelevant to Sumner's voluntary pursuit of a claim against Armstrong. Reading the provision in context provides even greater clarity that it does not cover attorney fees for litigation Sumner brings against Armstrong.

Under the above-quoted Paragraph 7(a), Paragraph 7(c) describes the procedure for indemnification, which requires providing notice of the claim to the indemnifying party who then has 15 business days to defend or settle the claim. The notice requirement makes Sumner's interpretation of the indemnification clause nonsensical; Sumner's noticing Armstrong of a claim against Armstrong would presumably be redundant.

Further discrediting Sumner's interpretation, Paragraph 7(c)(iv) describes indemnification procedures for a claim "that does not involve a claim or demand by a third party." This paragraph provides the indemnifying party (here, Armstrong) with the authority to defend or settle such claims within 15 business days. Reading this provision under Sumner's interpretation again yields the redundant result of giving Armstrong the authority to defend or settle claims brought by Sumner against Armstrong.

Even assuming ambiguity, such ambiguity would be read against the party that drafted the agreement—here, Sumner. *See Adkins v. Chrysler Fin. Corp.*, 344 F. App'x. 144, 148 (6th

Cir. 2009). But Sumner did not include a provision to override the clearly established American rule recognized under Kentucky law. As a matter of law, the Court finds that the indemnification clause does not cover Sumner's attorney fees for his claims against Armstrong, and thus Armstrong is not liable to reimburse Sumner on these grounds.

VIII.

Finally, Sumner seeks prejudgment interest for all three contracts related to this litigation: J07032, J10009, and J10007. As this Court finds that Sumner is not entitled to any damages under J10007, it considers only prejudgment interest at to contracts J07032 and J10009. Armstrong contends that Sumner is not entitled to prejudgment interest because he did not receive a judgment reducing those claims to a monetary amount liquidating the amount of commissions due.

Prejudgment interest is awarded "as a matter of right" for a liquidated demand. *See 3D Enterprises Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005). Liquidated claims are those that can be ascertained by "mere computation," *see id*. (quoting 22 Am.Jur.2d DAMAGES § 469 (2004)), or have been reduced to a certainty, *see Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 141 (Ky. 1991). This Court previously stated that Sumner's compensation is "obvious to anyone who c[an] multiply and add." *Sumner v. Armstrong Coal Co., Inc.*, 2012 WL 3746177 (W.D. Ky. 2012), *aff'd in part, rev'd in par*t, 533 F. App'x. 583 (6th Cir. 2013).

Armstrong cites *Nucor* as authority that the amount due for a breach must be determined prior to the question of interest. However, *Nucor* dealt with unliquidated damages. *See Nucor,* 812 S.W.2d at 141-42. The fact that the Court did not calculate a concrete monetary amount for

13

the parties when it ruled on liability is irrelevant—Sumner's damages became liquidated and due as a matter of right when the prior Order[12] became final.

Because the Court did not write the amount due to Sumner under J07032 and J10009 when it found Armstrong liable for commissions under them, Armstrong argues that the payments are "in the nature of settlement" and thus not subject to prejudgment interest. This argument is similarly unavailing; Armstrong's payments to Sumner are not part of a settlement.

Finally, Sumner did not waive his right to prejudgment interest by previously accepting Armstrong's payments, because Sumner reserved his right to seek such interest. Sumner filed a partial satisfaction of judgment dated November 19, 2012 related to payment of his commission under J07032. In this filing, Sumner acknowledged receipt of his commission but stated that the judgment remained unsatisfied in all other respects. Further, in his receipt and release form signed October 8, 2013, Sumner reserved the right to seek other "costs, fees, or interest" relating to J10009 under the Consulting Agreement. For these reasons, Sumner is entitled to prejudgment interest as to contracts J07032 and J10009.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record

---

[12] Dkt. No. 32.